### SIBLEY *v.* OBER & SONS COMPANY.

SIMMONS, J.—1. Where notes held by a creditor as collateral security are in the hands of the principal debtor for collection with the understanding that the proceeds are to be and remain the property of the creditor until the principal debt is paid, cotton received in payment of the collateral notes and sent to an agent of the creditor for sale must be accounted for by such agent to the creditor as property belonging to the latter.

2. There was evidence from which the trial judge, acting as a jury by the consent of parties, could find that the cotton in question belonged to the creditor and that the agent was affected with notice of his title.

3. Where the judge acting as a jury decides the case long after hearing the evidence and argument, he may act upon his recollection of the written evidence without having it in his possession at the time of deciding, provided he is satisfied that he remembers it, and especially if he remains of the same opinion as to the effect of it after reviewing it upon a motion for a new trial, in deciding which motion the evidence was all put before him again and re-examined.          *Judgment affirmed.*

May 8, 1891. Argued at the last term; reargued at this term.

Debtor and creditor. Principal and agent. Title. Notice. Practice. New trial. Before Judge RONEY. Richmond superior court. April term, 1890.

There were two counts in the declaration; one on an account as per bill of particulars annexed; the other alleging that Sibley was indebted to petitioners $2,000 besides interest, for that Sibley, on January 12, 1884, was appointed as an agent of petitioners under the terms of a written contract annexed, which was renewed for the years 1885 and 1886; that Sibley, on January 12, 1885, appointed Baker & Company as sub-agents of petitioners to sell one hundred tons of ammoniated superphosphates under the terms of a written

contract; that Baker & Company as such sub-agents, at
various dates mentioned from November 3, 1885, to December 21, 1885, shipped fifty bales of cotton weighing
21,729 pounds and worth $2,000, all the bales being
marked "O" and being proceeds of the phosphates sold
by Baker & Company as such sub-agents, and being
the property of petitioners, to Sibley, and about the
time of the first shipment notified him that all cotton so marked and shipped or to be shipped by
Baker & Company to him was the property of
petitioners and was the proceeds of the sale of the
phosphates under the contract; that the fifty bales were
duly received by Sibley and he sold them, applying the
proceeds to an indebtedness claimed to be due to him
from Baker & Company, and after demand made upon
him by petitioners to deliver or account for the cotton,
failed and refused either to deliver or account for it. Attached as an exhibit was the contract between petitioners
and Sibley, making him agent for petitioners for the sale
of their ammoniated superphosphate, and giving him
authority to appoint sub-agents. Also, the contract by
which Baker & Company were appointed sub-agents
for 1885, providing that petitioners were to ship to
Baker & Company one hundred tons of ammoniated
superphosphates, or as much more as might be mutually
satisfactory, at 350 pounds middling cotton per ton in
bags on board cars at Sparta, Georgia, to be settled for on
notes of Baker & Company to average due November 15,
1885, and payable at Sparta in bales in good merchantable order at railroad depot; that on May 1, 1885, or
sooner if possible, Baker & Company were to deliver to
petitioners, or their order, notes of the purchasers to
whom Baker and Company might have sold these goods,
for the gross amount of the sales, to be held by petitioners as collateral security for the payment of
Baker & Company's obligations, and all of the goods, as

also all proceeds therefrom, were to be in trust by Baker & Company for the payment of their notes to petitioners, and to be subject at all times to petitioners' order; that all proceeds of the goods as collected must be applied to the payment of Baker & Company's notes, whether they should have matured or not; and that the planters' notes would be returned to Baker & Company in ample time for collection.

The evidence for plaintiffs tended to show the following: Contracts were made between plaintiffs and Sibley, making him agent for a certain territory, and between Sibley, for plaintiffs, and Baker & Company, appointing them sub-agents as stated in the exhibits to the declaration. The firm of Baker & Company was dissolved March 23, 1886. They conducted a general merchandise and guano business. In 1884 and 1885 they were local agents for the sale of petitioners' guano, and during the same years dealt with Sibley as a cotton factor. In 1885 they collected cotton on cotton option notes belonging to petitioners, which notes were placed in their hands for collection by Sibley as general agent for petitioners. Baker & Company were to account to Sibley who appointed them local agents. Most of the notes taken by them for the guano were paid them in cotton which was shipped by them to Sibley, all of which cotton was marked "O." These shipments were from November 3d to December 19, 1885, and amounted to fifty bales, making 21,729 pounds. Besides these fifty bales, 5,710 pounds were ordered transferred from the account of one Courson to Baker & Company's guano account, making a total of 27,439 pounds paid by Baker & Company on the Ober guano notes. About the day of the first shipment of cotton so marked, Baker & Company, by letter properly stamped, addressed and mailed, notified Sibley that this and all other cotton shipped to him so marked would be for the account

of Ober's guano on Baker & Company; and the same thing was told by Baker & Company to Cranston, one of the firm of R. P. Sibley, after the shipment of the cotton; and also told Sibley himself before all the cotton was sold. The cotton was marked in the same way as Ober's goods for the preceding year were marked. Baker & Company did not draw any drafts against this cotton, nor did they receive any advances on it. They did receive account sales from Sibley, but never charged them up to Sibley on their books on account against him. He gave Baker & Company credit for this cotton on general account, and the first knowledge Baker & Company had of it was some time in the early part of 1886, but Baker & Company never authorized or ratified such disposition of the cotton or its proceeds. Baker & Company are insolvent, and defendant was informed on March 23, 1886, of such insolvency, which occurred some time before. There is a considerable amount still due Sibley by them. Plaintiffs have never been paid anything by Baker & Company on their indebtedness to plaintiffs, except so far as the fifty bales of cotton and the cotton from the Courson account extended. Besides the fifty bales and the Courson cotton, Baker & Company shipped to Sibley in 1885 about 1,500 bales, but shipped no cotton marked "O" other than these fifty bales. In the latter part of 1885, or about January 23, 1886, they turned over directly to plaintiffs all the uncollected farmers' notes taken by them in 1885, for the sale of Ober's guano, and they have made no further settlement with plaintiffs and consider their account settled (unless they be still indebted for about $300), though the notes given by them for the guano have not been cancelled so far as appears; they have never been called on since the delivery of these farmers' notes to pay anything on them; these notes had a face value of about $1,000, and they were

claimed by plaintiffs in fulfillment of the original contract made with Sibley as general agent.   If the fifty bales of cotton are not credited on Baker & Company's note to plaintiffs for $4,725, the Courson cotton would be the only credit on the note.

The evidence for the defendant tended to show the following: Baker & Company took only about seventy-five tons of the guano in 1885 ; it was worth $28 50 in currency, cotton averaging between eight and nine cents per pound in actual value.   Sibley was cotton factor for Baker & Company in 1884, as well as 1885, and plaintiffs knew of it both years.   Baker & Company were in good credit up to about the middle of January, 1886.   All cotton shipped by them to Sibley was invoiced "for sale on commission."   Sibley received only forty-eight bales of the cotton in question marked "O," and had no other instructions for sale of any cotton from Baker & Company than as by the heading on the invoice just mentioned.   Two bales in one shipment never reached him.   The forty-eight others came in the course of trade, consigned by Baker & Company with instructions to sell on commission all cotton shipped by them, and they sent Sibley nearly 1,500 bales with different marks, but with the same instructions.   The cotton in question was at once entered on their account and sales made just as of the other cotton, and Sibley regarded it as the cotton of Baker & Company, and sent them account sales as fast as he sold the cotton. He introduced invoices of the "O" cotton, and account sales ; the account sales showing that the cotton was sold at different dates from November 9, 1885, to January 23, 1886.   Sibley received no instructions from Baker & Company that all cotton marked "O" was for plaintiffs' account; did receive instructions to apply the Courson cotton to that account and did so, but had no notice that the cotton in question was plaintiffs' or was

so intended, until some time in March, 1886; when Baker so told Sibley (but one of Sibley's firm had received such notice the latter part of January, and it was admitted that notice to him was notice to Sibley), and at that time the cotton had all been sold. Baker & Company drew drafts which, while not on their face drawn on the identical cotton marked "O," Sibley paid on the faith of this cotton and of other cotton in store, this cotton being on their account and also in store, and paid drafts he would not have paid but for this cotton. He introduced a statement from Baker & Company's cotton-book, showing some drafts paid by him on account of this "O" cotton. Baker & Company failed about February 1, 1886. Defendant sent them account sales of this cotton, and they never objected to it being sold as theirs or being applied to their account; and also included it in the consolidated statement, and they made no objection, nor did they state that the proceeds were being improperly applied. In 1884 the cotton for plaintiffs' account was marked "OB." On September 21, 1886, defendant sued Baker & Company for $7,778.12, balance on account including a credit for the proceeds of the forty-eight bales of cotton, and on March 26, 1887, obtained a verdict for the sum sued for. Baker & Company did not send Sibley the planters' notes for guano as agreed, and were constantly being dunned for Sibley to remit on that account, but did not. The cotton shipped in 1884 marked "OB" was sold by defendant, and account sales rendered plaintiffs. The cotton in question sold for $1,584.10. The note of Baker & Company to plaintiffs was put in evidence. It was dated April 22, 1885, due on or before November 15, 1885, and was for $4,725, which might be discharged with cotton at fifteen cents per pound of grade not inferior to middling, and in case cotton was delivered of grade lower than middling, upon a basis of fourteen

and a half cents low middling, etc.   The consideration
of the note was stated in it to be 18,000 pounds of
guano sold to Baker & Company by plaintiffs.

The judge, to whom the case was submitted without
a jury, rendered judgment in favor of plaintiffs for
$1,584.10 principal, with interest and costs.   The de-
fendant moved for a new trial upon the following among
other grounds :

(1) Verdict contrary to law, evidence, etc.

(2) The material allegations in the petition are that
the cotton was proceeds of Ober guano, and title thereto
was held by Baker & Company in trust for plaintiffs,
and that with notice thereof R. P. Sibley sold same
and failed to credit proceeds to plaintiffs ; and said alle-
gations are not sustained by the proof; and the *allegata*
and *probata* do not agree.

(3) The judgment was improvidently granted and
without the evidence in the case being before the judge
at the time of the rendition thereof, in this :   The
court heard the evidence and argument in May, 1889,
when he reserved his opinion.   He subsequently, in
November, 1889, requested counsel to reargue the case ;
all the documentary evidence of defendant was in the
hands of defendant's counsel, who was preparing and
did prepare for the reargument.   Counsel for plaintiffs
and defendant attended at a day fixed for the reargu-
ment, when the reargument was postponed on account
of the illness of the court.   Thereafter, and without
having seen the documentary evidence of defendant since
the hearing in June, 1889, the court, on February 28,
1890, decided the case.   (As to this ground the court
stated :   On the trial the case was fully argued, both
on law and facts, and decision was reserved.   After
some time had elapsed, the court requested counsel as a
favor to reargue the case, and a time was agreed upon
for a rehearing.   When the time arrived one of the

counsel was not ready to proceed, and another day was fixed, at which time the judge was unwell and no hearing was had. Finally, desiring to dispose of the case and not wishing to trouble counsel further, and being from the evidence sufficiently refreshed as to all the facts of the case, the opinion was rendered as stated.)

The motion was overruled, and defendant excepted.

J. R. LAMAR, for plaintiff in error.

HARPER & BROTHER, *contra.*